UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATRECE SMALL,<br><br>                               Plaintiff,<br><br>      v.<br><br>TWO TREES MANAGEMENT CO. LLC,<br>125 COURT STREET LLC, 30 MAIN LLC,<br>and DW ASSOCIATES, L.P.,<br><br>                              Defendants. | Civil Action No.: 19 Civ. 1210<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Katrece Small ("Plaintiff" or "Ms. Small"), by and through her attorneys Latham & Watkins LLP, for her complaint against Defendants Two Trees Management Co. LLC ("Two Trees"), 125 Court Street LLC ("125 LLC"), 30 Main LLC ("30 Main"), DW Associates, L.P. ("DW Associates," and together with Two Trees, 125 LLC, and 30 Main, the "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a case of long-standing racial discrimination perpetrated by Defendants—well-financed real estate companies—against Ms. Small, a black woman and single mother whom Defendants have refused to allow to transfer out of a 400-square-foot studio apartment with her school-age son, K.S. Defendants' racial discrimination arises from the fact that they freely permit market-rate tenants to transfer apartments within the Court House apartment complex ("Court House") in Brooklyn, but subject low-income tenants—who are overwhelmingly racial or ethnic minorities, like Ms. Small and her son—to a "no-transfer" policy. This no-transfer policy violates the Fair Housing Act ("FHA") and New York City Human Rights Law ("NYCHRL") because it has a disparate impact on minority tenants.

2. All the while, Defendants have benefited from generous state tax subsidies by virtue of housing low-income minority tenants such as Ms. Small and her young son. Court House, which is owned and managed by Defendants, was financed through the New York State Housing Finance Agency's 80/20 Program (the "80/20 Program"), a housing assistance program that grants tax-exempt financing to apartment complex owners that make a certain percentage of their units available to low-income renters.

3. In 2005, Ms. Small moved into one of Court House's several dozen low-income housing units, a 400-square-foot studio apartment. Starting in 2007, Ms. Small began submitting requests to be transferred to a larger apartment to Court House management, who were acting on behalf of Defendants. For more than a decade, each time she asked to be transferred, she was told by Defendants and their agents that there existed a "no-transfer" policy for low-income tenants at Court House. But although Defendants subject low-income tenants to a "no-transfer" policy, market-rate tenants may transfer freely between apartments. Because a much higher percentage of low-income tenants at Court House are black or Hispanic than market-rate tenants, Defendants' low-income "no-transfer" policy has a disparate impact on minority tenants, in violation of the FHA and NYCHRL.

4. After a decade of fruitless pleas by Ms. Small to Defendants, this action now seeks to remedy the racially discriminatory treatment that Ms. Small has suffered, and compensate her for the mental, physical, and emotional suffering that she has endured as a result of Defendants' repeated violations of the law.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over the New York City law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are located within this District in the State of New York and a substantial part of the events giving rise to the claims occurred within this District in the State of New York.

## PARTIES

7. Plaintiff Katrece Small is single mother who currently resides at 125 Court Street, Brooklyn, NY 11201. At all relevant times hereto, Ms. Small has rented an apartment at Court House through the 80/20 Program and has qualified as a low-income tenant for such program.

8. Defendant Two Trees is a New York limited liability company and the rental management company for Court House. Two Trees has owned, managed, and developed more than $4 billion in real estate and currently owns and manages more than 2,000 apartments. Its principal place of business is 45 Main Street, Suite 1200, Brooklyn, NY 11201.

9. Defendant 125 LLC is a New York limited liability company and owner of Court House. Its principal place of business is 45 Main Street, Suite 1200, Brooklyn, NY 11201.

10. Defendant 30 Main is a New York limited liability company and sole member of 125 LLC. 30 Main conducts business in Brooklyn, New York.

11. Defendant DW Associates is a New Jersey limited partnership and the general manager of 30 Main. DW Associates conducts business in Brooklyn, New York.

12. At all relevant times, each Defendant was and/or is the agent, employee, or representative of each of the other Defendants. Each Defendant, in doing the acts or in omitting to act as alleged in this complaint, was acting in the course and scope of its actual or apparent

authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each other Defendant as principal.

## FACTUAL ALLEGATIONS

13. Ms. Small and her son, K.S., are black.

14. Based on her income, Ms. Small qualifies for low-income housing through the 80/20 program at Court House.

15. The 80/20 Program is a housing assistance program that grants tax-exempt financing to apartment complex owners who make a certain percentage of the units in the complex available to low-income renters. Under the program, at least 20 percent of the units must be reserved for households with incomes at 50 percent or less of the local Area Median Income ("AMI"), adjusted for family size, or at least 25 percent of the units must be reserved for households with incomes at 60 percent or less of the local AMI, adjusted for family size. The maximum rent price of the low-income units cannot exceed 30% of the applicable income limits. The remaining units in the complex can be rented at market rates.

16. In return for making apartments available to tenants under the 80/20 Program, Defendants received generous tax subsidies. As a result, Defendants have received a substantial benefit from the 80/20 Program.

17. In 2007, Defendants were sued for racial discrimination by a low-income Court House applicant, who alleged that Defendants violated federal, state, and local laws by creating onerous application procedures and eligibility requirements for only low-income applicants, which had the effect of discriminating against racial and ethnic minorities and the disabled. *See Woodard v. 125 Court House, LLC et al.*, No. 07-cv-04215 (BMC) (RLM) (E.D.N.Y.); https://brooklynrail.org/2007/12/local/lawsuit-claims-discrimination-at-court-house.

18.   Defendants have also previously been accused of, and ultimately admitted to, significantly overcharging Court House residents for rent, despite receiving more than $10 million in tax relief under a program that required them to provide rent-stabilized apartments. *See* https://ny.curbed.com/2016/3/29/11320836/two-trees-125-court-street-rent-overcharge; https://www.propublica.org/article/brooklyn-officials-ask-state-to-investigate-rent-overcharges?utm_campaign=sprout&utm_medium=social&utm_source=twitter&utm_content=1459180028.   Residents have also alleged that Court House has suffered from dangerous and deteriorating conditions, including widespread mold and other assorted issues.  *See* https://nypost.com/2014/05/18/tenants-accuse-developer-two-trees-of-moldy-apartments/.

    **A.**    <u>**Defendants Maintain a No-Transfer Policy for Only the Low-Income Tenants at Court House**</u>

19.   Despite the substantial tax benefits that they have received, Defendants, through their representatives, have engaged in racial discrimination against Ms. Small.  Since approximately May 2005, Ms. Small has lived in a 400-square-foot studio apartment, which is one of several dozen low-income units at Court House.  Ms. Small occupied the apartment alone until the birth of her son, K.S., in 2010.  Ms. Small and K.S. have shared the unit at Court House since he was born.

20.   Over the past 10 years, Ms. Small has repeatedly asked Defendants to transfer her to a larger apartment at Court House within the 80/20 Program, and at all relevant times, Ms. Small has been willing to pay any increase in rent that resulted from such a transfer.

21.   Starting before K.S.'s birth, Ms. Small submitted requests to Defendants and their agents seeking to transfer to a larger apartment, all of which were met with no adequate response, or worse, obfuscation.  Specifically, in 2007, Ms. Small first inquired about the possibility of transferring to a one-bedroom unit within the 80/20 Program at Court House, but was told by Court

House's property manager at the time, upon information and belief, Jodie Sadovsky, that Court House had a "no-transfer policy" for low-income tenants.

22.     In 2009, when Ms. Small became pregnant with K.S., she again asked the property manager at Court House, upon information and belief, Alexandra Barnes, about transferring into a larger unit.  Again, Defendants, through their manager at Court House, denied her request due to Court House's purported "no-transfer" policy for low-income tenants.

23.     Since then, Ms. Small has repeatedly asked Defendants to transfer her into a larger apartment at Court House within the 80/20 Program.  In one such instance, Ms. Small specifically asked about a transfer to a one-bedroom apartment that had been vacated by another low-income tenant at Court House.  But Defendants denied that request, and all her other requests, telling Ms. Small repeatedly for a decade that low-income tenants were subject to a strict "no-transfer" policy.

24.     On December 22, 2016, Ms. Small received a letter from Mayra Rodriguez, the low-income housing leasing agent for Court House.  *See* Ex. A, Dec. 2016 Letter.  In response to Ms. Small's most recent request to transfer to a larger apartment within the Court House 80/20 Program, Defendants' letter stated that she would be placed on a "wait list" for a new apartment in Court House.  *Id.*  But this wait list is not a transfer list; it is, instead, merely the lengthy general wait list for all low-income housing applicants at Court House, and does not distinguish between internal (i.e., Court House) applicants and external applicants.  Indeed, Ms. Small was informed that there were 267 people ahead of her on the wait list.  *Id.*

25.     On December 5, 2017, Ms. Small spoke with Janet Santos, yet another employee of Defendants, and requested a transfer to a specific low-income two-bedroom unit at Court House that was soon to be vacated.  Ms. Santos reiterated Defendants' purported "no-transfer" policy for low-income tenants, and stated that Ms. Small could only obtain a larger unit if she was selected

from the general wait list for low-income applicants. However, no such "no transfer" policy applies to market-rate tenants, whom Defendants permit to transfer freely.

26. After learning of Ms. Small's treatment at the hands of Defendants, the non-profit Fair Housing Justice Center ("FHJC") conducted a test to determine whether Defendants permit market-rate tenants to transfer freely between apartments. *See* Ex. B, FHJC Test at 1. On December 21, 2016, the tester, a white woman posing as a single mother with a 9-month-old boy, spoke to an agent of Defendants named "Francesca" at the leasing office at Court House. *Id.* When the tester inquired about market-rate studio apartments, she was informed that there were several available studio apartments within her stated budget of approximately $3,300 per month. *Id.* When the tester inquired whether she would be permitted to transfer to a larger apartment before her lease expired, she was told that she could freely transfer as long as she was upgrading to a larger unit. *Id.* at 1, 10.

27. As this testing demonstrates, Defendants apply a "no-transfer" policy to Court House's low-income tenants, yet permit the market-rate tenants to freely transfer between apartments at Court House.

**B. Demographic Data Shows That a Majority of Court House's Low-Income Tenants are Black or Hispanic**

28. Demographic data demonstrates that the majority of Court House's low-income tenants are black or Hispanic, and only a small percentage are white.

29. In response to a FOIL request submitted by FHJC, the New York City Housing Development Corporation produced the 2015 Tenant Data Workbook ("Tenant Data Workbook") for Court House. *See* Ex. C, Tenant Data Workbook. The Tenant Data Workbook contains data on the race and ethnicity of Court House's low-income tenants. *See id.*

30.     According to the Tenant Data Workbook, 109 low-income tenants lived at Court House in 2015.  *Id.*  At that time, Court House's low-income tenants had the following demographic breakdown:

| Race/Ethnicity of Low-Income Tenants | Number of Low-Income Tenants | Percentage |
|---|---|---|
| Black/non-Hispanic ("black") | 39 | 36% |
| Black/Hispanic | 2 | 2% |
| White/Hispanic ("Hispanic") | 15 | 14% |
| Other/Hispanic | 25 | 23% |
| White/non-Hispanic ("white") | 16 | 15% |
| Asian/non-Hispanic ("Asian") | 5 | 5% |
| Other/non-Hispanic | 1 | 1% |
| Inconclusive | 6 | 6% |
| **Low-Income Tenant Totals** | **109** | **102%**[1] |

*Id.*

31.     As can be seen from the table above, the vast majority of Court House's low-income tenants identified as racial and/or ethnic minorities.  Most notably, approximately 36% were black, 23% were other/Hispanic, 14% were Hispanic, and 2% were black/Hispanic.  Thus, approximately 75% of Court House's low-income tenants identified as black or Hispanic.  Only 15% of the low-income tenants identified as white.

C. **Demographic Data Shows That a Majority of Court House's Market-Rate Tenants are White**

32.     In stark contrast to Court House's low-income tenants, the market-rate tenants are predominantly white.

33.     In support of her claims, Ms. Small retained the services of Dr. Lance Freeman, a Professor in the Urban Planning program at the Graduate School of Architecture, Planning, and

---

[1] The total percentage exceeds 100% because each of the percentages has been rounded.

Preservation at Columbia University with more than two decades of experience in analyzing demographics based on census data. Dr. Freeman was asked to assess the racial and ethnic makeup of Court House's total tenant population.

34. To assess the makeup of Court House's total tenant population, Dr. Freeman obtained and analyzed data from the most recent U.S. census—specifically, the block level data for 125 Court Street, given that Court House occupies the entire block at that address. *See* Ex. D, 2010 Census Data for 125 Court Street. Dr. Freeman concluded that the 2010 census data for the 125 Court Street block level provides a reasonable proxy for analyzing demographic patterns for the total Court House population.

35. Dr. Freeman noted that Court House's Affirmative Fair Marketing Plan/Tenant Selection Plan for 80/20 Affordable Apartments (the "Fair Marketing Plan") shows that Court House has 320 total units. *See* Ex. E, Fair Marketing Plan at 1. Similarly, the 2010 census data shows that the 125 Court Street block contains 325 housing units. *See* Ex. D, 2010 Census Data for 125 Court Street. Thus, Dr. Freeman concluded that the census data contains information almost entirely (if not exclusively) about Court House residents.

36. The total number of residents in the census block also confirms that the census data provides an accurate representation of Court House tenants. As explained above, 109 low-income tenants reside at Court House. *See* Ex. C, Tenant Data Workbook. As low-income tenants comprise approximately 20% of Court House's total population according to the Fair Marketing Plan, s*ee* Ex. E, Fair Marketing Plan at 1, market-rate tenants comprise the remaining 80%, or roughly 436 market-rate tenants. Combined, the market-rate tenants (436) and low-income tenants (109) total 545 residents—nearly identical to the 547 residents set forth in the 2010 census data.

*See* Ex. D, 2010 Census Data for 125 Court Street. Consequently, the census block data is a reasonable proxy for analyzing the demographics of the residents of 125 Court Street.

37. After reviewing the census data, Dr. Freeman then determined the following regarding the race and ethnicity of Court House's tenants, with 95% confidence intervals in parentheses:

| Race/Ethnicity of Court House Tenants | All Court House Tenants | Low-Income Court House Tenants |
|---|---|---|
| Black or Hispanic | 23.9% (20.4% - 27.5%) | 75.2% (67.1% - 83.3%) |
| All minorities (including black or Hispanic) | 37.7% (33.6% - 41.7%) | 85.3% (78.7% - 92.0%) |

38. As evidenced by Dr. Freeman's findings, black and Hispanic tenants comprise more than three-quarters of the low-income population at Court House, but comprise less than one-quarter of the total Court House population. Similarly, tenants classified as any minority race or ethnicity account for the overwhelming majority of low-income tenants at Court House, despite comprising just over a third of the total tenant population.

39. The following table illustrates the total percentages of white, black or Hispanic, and other minority tenants at Court House:

| Race/Ethnicity of Court House Tenants | All Court House Tenants | Low-Income Court House Tenants |
|---|---|---|
| White | 62.3% | 14.7% |
| Black or Hispanic | 23.9% | 75.2% |
| Other minorities | 13.8% | 10.1% |

40. Even without removing the low-income tenants from the total population of Court House—in other words, isolating the market-rate tenants—the differences are stark. Court

House's total residents are 62.3% white, 23.9% black or Hispanic, and 13.8% other minority. These figures are drastically different from those of Court House's low-income tenants, who are 14.7% white, 75.2% black or Hispanic, and 10.1% other minority.

41. Removing certain low-income tenants from the census data reveals even more stark numbers. As explained above, according to the census data, 547 tenants lived in the 125 Court Street census block in 2010. If all of the black and Hispanic low-income tenants are removed from the Court House population, there are 466 tenants remaining. Of those 466 remaining tenants, approximately 73% are white, 9% are Hispanic, and 3% are black. Viewed another way, a staggering 72% of the black tenants in Court House are in the low-income housing program.

### D. Ms. Small Has Identified a Less Discriminatory Alternative Policy

42. Ms. Small has also identified a less discriminatory alternative policy.

43. Rather than placing current low-income tenants and external low-income applicants on the same wait list at Court House—which does not distinguish between new applicants (i.e., those never before in the 80/20 Program), transfers of low-income tenants outside Court House, and transfers of low-income tenants within Court House—Defendants could instead maintain both an internal and external wait list, and express a preference for internal transfer requests.

44. At least two low-income housing programs in New York already use this less discriminatory alternative.

45. First, the New York City Housing Authority's Tenant Selection and Assignment Plan ("TSAP") sets forth clear procedures for processing unit transfer requests in the public housing context. See Ex. F, TSAP. The TSAP expresses a preference for transfer applicants within a complex, stating that "the TSAP system will select intra-development transfers (transfers within the same development) of equal priority before inter-development transfers (transfers outside of current development)." Id. at 34-35; see also id. at 53-54, 57.

11

46. The TSAP also expresses a preference for transfer applicants attempting to leave extremely overcrowded or overcrowded units. *See* Ex. F, TSAP at 38, 41, 52, 53. In the TSAP, a studio apartment is "extremely overcrowded" with two residents if the occupants are "[t]wo adults who are neither married nor registered as domestic partners, or a single adult with a child of six (6) years of age or more." *Id.* at 56. A studio apartment is "overcrowded" with two residents if the occupants are a "[m]arried couple, two persons registered as domestic partners[,] or a single adult with a child of less than six (6) years of age." *Id.* Ms. Small's apartment would qualify as "extremely overcrowded" under the TSAP program.

47. Second, the New York City Department of Housing Preservation and Development's ("HPD") Mitchell-Lama Rules ("Mitchell-Lama Rules") provide similar occupancy priorities. *See* Ex. G, Mitchell-Lama Rules. The Mitchell-Lama Rules provide, in relevant part:

> (i) Occupancy priorities. The following occupancy priorities shall apply to all housing companies:
>
> > (1) First priority. *Tenant/cooperators currently residing in a development whose household composition renders them eligible for a larger or smaller apartment shall be given first priority for an internal transfer.* First preference shall be given to tenant/cooperators who are moving to a smaller apartment. No priority shall be given to residents seeking additional apartments for members of their household, or for non-resident family members or any other parties. The housing company shall maintain an internal transfer list by apartment size, listed in chronological order by date of receipt of transfer request. If, at any time, a tenant/cooperator's name has been omitted from the internal transfer list in error, and said tenant/cooperator can present adequate documentation satisfactory to the housing company or its managing agent to substantiate an earlier request for a transfer, said tenant/cooperator's name shall be inserted into the internal list in the corrected date order. Insertions to the internal transfer list shall be submitted to HPD for prior written approval.

*Id.* at 6 (emphasis added).  The Mitchell-Lama Rules explicitly require the use of both an "internal transfer list" and an "external list."  *See id.* at 5-7.

48. Moreover, policies that express a preference for internal transfers make good sense. These policies help maintain community stability and continuity, prevent overcrowding, and avoid potential discrimination against low-income tenants on the basis of familial status.

### E. Ms. Small Has Been Harmed by Defendants' Refusal to Allow Her and Her Son to Transfer to a Larger Unit

49. Ms. Small's apartment is insufficient to accommodate two residents, particularly a mother and child of the opposite sex.  At 400 square feet, the apartment is extremely small and lacks the living space, storage capacity, and, most importantly, privacy that Ms. Small needs in order to raise her growing son.

50. Despite the fact that K.S. is one of the tallest children in his class, Ms. Small and her son share a bed because their apartment lacks space for a second bed.  In fact, the apartment cannot even fit a couch.  There is also insufficient space for their clothes—Ms. Small can only keep clothes for the given season in the apartment and is forced to store out-of-season clothes elsewhere.  Virtually none of K.S.'s toys, including his bicycle, can fit in the apartment.

51. Defendants' refusal to transfer Ms. Small to a larger apartment has severely stunted K.S.'s educational and social development.  Although he has made friends at school, he is unable to invite them to his home because there is no room for them to do school work or play indoors. Further, K.S. does not have a desk at which he can study or do his homework, a problem that will only be exacerbated as K.S. advances in school.

52. Additionally, Ms. Small is becoming increasingly concerned about privacy for both her and her son.  Not only do they share the same bed, but Ms. Small and her son also do not have separate areas to dress and get ready in the morning.

53. Strikingly, the apartment is unsuitable for two people by the terms of Defendants' own Fair Marketing Plan, which states that "[o]nly single person households may occupy a studio apartment." Ex. E, Fair Marketing Plan. In other words, although Ms. Small is entitled to live in her studio apartment at Court House because she met the appropriate criteria when she first leased it before K.S.'s birth, and she is therefore "grandfathered in" according to Defendants, it is of inappropriate size now.

54. On the other hand, Ms. Small enjoys living at Court House and the surrounding neighborhood. Ms. Small considers both the building and the neighborhood to be her home. Court House is the only home K.S. has ever known—he has slept almost every night of his life there. Leaving Court House would cause significant disruptions to K.S.'s school and social life. Unfortunately, however, life has become untenable in such close quarters.

55. By reason of the foregoing, Defendants have directly and substantially injured Ms. Small by engaging in racial discrimination and thereby denying her the opportunity to have access to adequate housing that would substantially improve the quality of her life.

56. Defendants' unlawful actions described above were, and are, intentional, willful, and/or have been and are implemented with callous and reckless disregard for Plaintiff's statutorily protected rights.

## FIRST CLAIM FOR RELIEF
### (FAIR HOUSING ACT 42 U.S.C. § 3604(B): DISPARATE IMPACT RACIAL DISCRIMINATION)

57. Plaintiff restates and incorporates by reference each and every fact in the preceding paragraphs of the Complaint as if fully set forth herein.

58. Under 42 U.S.C. § 3604(b), the FHA provides that it is illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race."

59. Defendants violated and continue to violate Section 3604(b) of the FHA by discriminating against Plaintiff and other low-income tenants at Court House by subjecting them to a "no-transfer" policy, while allowing market-rate tenants to move freely between units.  As the majority of low-income tenants at Court House identify as either black or Hispanic, the no-transfer policy has a discriminatory impact on Court House's minority tenants.

60.  Defendants' conduct was willful, intentional, and in reckless disregard for Plaintiff's rights.

61. Plaintiff is an "aggrieved person," as defined in the FHA, 42 U.S.C. § 3602(i), and has suffered damages as a direct and proximate result of Defendants' discriminatory conduct.

62. Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(NEW YORK CITY HUMAN RIGHTS LAW: DISPARATE IMPACT RACIAL DISCRIMINATION)

63. Plaintiff restates and incorporates by reference each and every fact in the preceding paragraphs of the Complaint as if fully set forth herein.

64. Section 8-107(5)(a)(1) of the NYCHRL prohibits any owner or managing agent of a housing accommodation from discrimination because of the "actual or perceived race, creed, [or] color" of any person "in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith."   Similarly, Section 8-107(17) of the NYCHRL states that discrimination can be established when a practice "results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

65. Defendants violated Sections 8-107(5)(a)(1) and 8-107(17) of the NYCHRL by discriminating against Plaintiff and other low-income tenants at Court House by subjecting them to a "no-transfer" policy, while allowing market-rate tenants to move freely between units. As the majority of low-income tenants at Court House identify as either black or Hispanic, the no-transfer policy has a discriminatory impact on Court House's minority tenants.

66. Defendants' conduct was willful, intentional, and in reckless disregard for Plaintiff's rights.

67. Plaintiff is an "aggrieved person," as defined in Section 8-502(a) of the NYCHRL, and has suffered damages as a direct and proximate result of Defendants' discriminatory conduct.

68. Accordingly, under Sections 8-502(a) and (g) of the NYCHRL, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (NEW YORK CITY HUMAN RIGHTS LAW: DISPARATE IMPACT RACIAL DISCRIMINATION)

69. Plaintiff restates and incorporates by reference each and every fact in the preceding paragraphs of the Complaint as if fully set forth herein.

70. Section 8-107(5)(a)(2) of the NYCHRL prohibits any owner or managing agent or other person "having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation" from declaring or causing to be declared, either directly or indirectly, discriminatory statements against anyone seeking to rent or purchase real estate based on the individual's "race, creed, [or] color." Similarly, Section 8-107(17) of the NYCHRL states that discrimination can be established when a practice "results in a disparate impact to the detriment of any group protected by the provisions of this chapter," and "the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to

a significant business objective of the covered entity or does not contribute to the disparate impact."

71. Defendants violated Section 8-107(5)(a)(2) and 8-107(17) of the New York City Administrative Code by making or causing to be made discriminatory statements against Plaintiff in that Defendants stated that Plaintiff could not transfer apartments, while market-rate tenants were allowed to move freely between units. As the majority of low-income tenants at Court House identify as either black or Hispanic, the statements regarding the no-transfer policy had a discriminatory impact on Court House's minority tenants.

72. Defendants' conduct was willful, intentional, and in reckless disregard for Plaintiff's rights.

73. Plaintiff is an "aggrieved person," as defined in Section 8-502(a) of the NYCHRL, and has suffered damages as a direct and proximate result of Defendants' discriminatory conduct.

74. Accordingly, under Sections 8-502(a) and (g) of the NYCHRL, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a) Declaring that Defendants' and their agents' discriminatory practices violate both the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.* and the New York City Human Rights Law § 8-107 *et seq.*;

b) Enjoining Defendants, their agents, employees, and successors, and all other persons in active concert or participation from:

1. Denying or otherwise restricting the transfer of apartment units on the basis of a person's status as a low-income tenant at any of Defendants' properties, including Court House;

2. Making, printing, or publishing any statement with respect to the transfer of apartment units that indicates any restriction, limitation, or discrimination on the basis of status as a low-income tenant;

3. Representing to any person that they are restricted from or otherwise unable to transfer apartments because of their status as a low-income tenant;

4. Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling because of their status as a low-income tenant;

5. Aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by the FHA and/or NYCHRL; and

6. Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of any rights granted or protected by the FHA and/or NYCHRL.

c) Ordering Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

1. Make all necessary modifications to their policies, practices, and procedures to comply with fair housing laws;

2. Train all management, agents, and employees on discrimination laws;

18

3. Display an Equal Opportunity logo (or statement to that effect) on all advertisements for rental property and display Department of Housing and Urban Development, state, and local fair housing posters in all offices;

4. Allow monitoring of their approved tenant transfers and transfer requests;

5. Retain records to allow for appropriate monitoring;

6. Develop written procedures on transfer processes and fair housing policies to be distributed to all staff, tenants, and rental applicants;

7. Establish a system so that their employees and agents can be tested for unlawful discriminatory practices;

8. Transfer Plaintiff into the next available low-income two-bedroom apartment at Court House at the applicable rate for a low-income tenant in the 80/20 Program; and

9. Transfer Plaintiff into the next available market-rate two-bedroom apartment at Court House at the applicable rate for a low-income tenant in the 80/20 Program or at a similar reduced rate, until such time as she is transferred into a low-income, two-bedroom apartment.

d) Awarding such damages to Plaintiff for any economic loss, loss of housing opportunity, loss of rights, as well as for the humiliation, embarrassment, and mental, emotional, and physical distress suffered due to Defendants' discriminatory conduct;

e) Awarding punitive damages to Plaintiff;

f) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g) Granting Plaintiff such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims herein.

Dated: February 28, 2019
   New York, New York

      /s/ Sandeep Savla
Sandeep Savla
Mark Pesce
Ryan Jones (*of counsel*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Phone: (212) 906-1200
Facsimile: (212) 751-4864
Sandeep.Savla@lw.com
Mark.Pesce@lw.com
Ryan.Jones@lw.com

*Attorneys for Plaintiff Katrece Small*